AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

iPhone cellular phone
Model Number: A1456
Serial Number: 358540055346145

)
)
)
)
)
)

Case No. '14 MJ 9185

FILED

DEC 10 2014

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

MCB
12/9/14

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ Southern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. 1324(a)(ii) | Transporting Illegal Aliens |
| 8 U.S.C. 1324(a)(iii) | Harboring Illegal Aliens |

The application is based on these facts:
See attached affidavit of Special Agent Brian M. Quigg

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Brian M. Quigg, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12-10-2014 @ 9:30 a.m.

*Judge's signature*

City and state: El Centro, California

Peter C. Lewis, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## <u>DESCRIPTION OF PROPERTY TO BE SEARCHED</u>

The property to be searched is described as:

      iPhone cellular phone

      Model Number: A1456

      Serial Number: 358540055346145

      (**"TARGET TELEPHONE #2"**)

The device is in the custody of Homeland Security Investigations, Assistant Special Agent in Charge, Calexico, California, 2052 North Waterman Avenue, El Centro, California 92243.

## ATTACHMENT B

## PROPERTY/ITEMS TO BE SEARCHED

The items to be seized are electronic data that constitute evidence or fruits of the commission of a criminal offense, and electronic data which is and has been used as the means for committing a criminal offense. The specific criminal offenses involved are violations of Title 8 U.S.C. 1324(a)(ii) and (iii), Transporting Illegal Aliens and Harboring Illegal Aliens.

Communications, records, call detail records, data, any deleted data, including but not limited to emails, phone numbers, text messages, photographs, audio files, videos, or location data:

     a.    tending to indicate efforts to transport and harbor illegal aliens;

     b.    tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to prove the transportation and harboring of illegal aliens;

     c.    tending to identify co-conspirators, criminal associates, or others involved in the transport and harboring of illegal aliens;

     d.    tending to identify travel to or presence at locations involved in the smuggling of illegal aliens, such as stash locations, storefronts, delivery points, and residence locations associated with the transport and smuggling of aliens;

     e.    tending to identify the user of, or persons with control over or access to, the subject phone; or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.



# AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR A SEARCH WARRANT

I, Brian M. Quigg, being duly sworn, declare and state:

## PURPOSE OF THE AFFIDAVIT

1.     This affidavit supports an application to search the following target devices:

      a.    T-Mobile Onetouch, Model Number: 7024W-2CB5US1-R, Serial Number: 013775001700071 ("**TARGET TELEPHONE #1**"); and

      b.    iPhone, Model Number: A1456, Serial Number: 358540055346145 ("**TARGET TELEPHONE #2**");and

      c.    Samsung cellular phone, Model Number: GT-I9100 Serial Number: RF1C7AAGR9A ("**TARGET TELEPHONE #3**");

      d.    ZTE cellular phone, Model, Number: Z998, Serial Number: 321532890136 ("**TARGET TELEPHONE #4**"); and

      e.    Motorola cellular phone, Model Number: A956 Serial Number: L636QA4FVD ("**TARGET TELEPHONE #5**"),

as described in Attachment A, and seize evidence of crimes, specifically, Title 8, U.S.C. § 1324(a)(ii), Transporting Certain Aliens, and Title 8, U.S.C. § 1324(a)(iii), Harboring and Shielding Certain Aliens.

1

2.     **TARGET TELEPHONES #1** and **#2** were seized from Jose Duarte ("DUARTE") by officers on or about November 15, 2014, after his arrest, and are currently in the government's possession.

3.     **TARGET TELEPHONES #3, #4** and **#5** were seized from Kendra TELFORD's ("TELFORD") Dodge Durango (plate BJC0527 Arizona license) on November 19, 2014. **TARGET TELEPHONES #3, #4,** and **#5** are currently in the government's possession.

4.     Based on the information below, there is probable cause to believe that a search of **TARGET TELPHONES #1, #2, #3, #4,** and **#5** will produce evidence of the aforementioned crimes, as described in Attachment B.

5.     In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of human smuggling, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

## EXPERIENCE AND TRAINING

6.     I am a Special Agent ("SA") with the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HIS"). I have been a Special Agent with HSI since November of 2010.  I am currently assigned to the Assistant Special Agent in Charge, Calexico, California, Human Smuggling/Human Trafficking Border Enforcement Strike Taskforce ("BEST") Group. My prior assignments included approximately seventeen months in Narcotics Group 2 and one year in the Administrative Services Group.

7.     I have completed 23 weeks of intensive training in criminal investigations at the Federal Law Enforcement Training Center in Glynco, Georgia (2011).  As a result of my training and experience as a Special Agent, I am familiar with federal criminal statues to include violations of Title 8 of the United States Code.

8.     I am a graduate of a state/local police academy in 2001.

9.     I have previously served as a police officer with the Massachusetts Transportation Authority, Transit Police Department in Massachusetts with a total of ten years of service. Five of those ten years I served as a Detective working multiple criminal investigations.   I also served five years in the United States Marine Corps.

10.     I have participated in and conducted investigations of violations of Federal criminal laws, including illegal alien smuggling in violation of Title 8 of the United States Code.  These investigations resulted in arrests of individuals who have smuggled illegal aliens, received payment for their participation in the alien smuggling ventures, and the seizure of vehicles and criminal proceeds.  Also, these investigations have resulted in the disruption of the various human smuggling operations and the breakdown of their organizational structure. Through these investigations, training, and countless hours of interviews, I am familiar with the operations of Alien Smuggling Organizations operating in Mexico and in the United States.

11.     I have conducted investigations concerning the identification of co-conspirators through the use of telephone records, photographs, criminal records, and other documents.  I have also participated in the debriefings of many of the individuals arrested who later cooperated with the Government.  I have utilized

3

these cooperating witnesses to further identify the methods, modes, and subjects involved in various ASOs.  I have participated in the execution of search warrants and conducted surveillance in connection with numerous alien smuggling investigations.

12.     Based on my training and experience as a SA with HSI, my training and experience as a team member of BEST, and conversations with other experienced investigators from HSI, U.S. Border Patrol, U.S. Customs and Border Protection, and other law enforcement agencies, I am aware that alien smuggling operations typically operate as follows:

a.      Smuggled aliens are brought to staging areas in Mexico near the United States/Mexico border by alien smugglers who intend to bring the aliens into the United States illegally.

b.      The aliens are then smuggled across the United States/Mexico border and taken to private homes or apartments often referred to as "stash houses" or "drop houses," south of the United States Border Patrol checkpoints.  Generally, these "stash houses" are located in areas such as Brawley, Calexico, or El Centro, California or other areas near the border region.

c.      The smuggled aliens are typically harbored at these locations until the ASOs can transport their human cargo north away from the border area and to various destinations within the United States.

d.      After surreptitiously passing through the checkpoints, the smuggled aliens are transported to secondary "stash houses" in areas of the Inland Empire, California such as Indio, Coachella, or other cities north of the checkpoints.

e.      The alien smugglers hold the smuggled aliens at these "drop

4

houses" until their sponsor, usually a relative or a friend, pays the alien smugglers a smuggling fee.

f.     After the smuggling fees are paid, arrangements are made for the delivery of the smuggled aliens to their sponsor.

g.     At times, those arrangements consist of alien smugglers driving the smuggled aliens to easily accessible public areas, such as fast food restaurants and convenience stores, where the smuggled aliens are delivered to their sponsors. Sometimes, but less frequently, the sponsor "buys out" the smuggled alien directly from the smugglers at the "drop house."

13.     Based on my training and experience as a SA with HSI, my training and experience as a team member of BEST, and conversations with other experienced investigators from HSI, U.S. Border Patrol, U.S. Customs and Border Protection, and other law enforcement agencies, I am also aware that:

a.     Smugglers and traffickers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b.     Smugglers and traffickers will use cellular telephones because they are able to actively monitor the progress of their illegal activities from point of origin in Mexico to point of destination in the United States.

c.     Smugglers and traffickers and their accomplices will use cellular telephones because they can easily arrange and/or discuss smuggling fees, availabilities of transportation, and costs associated with smuggled aliens.

d.     Smugglers and traffickers will use cellular telephones to direct, coordinate the transfer and acquisition of payment for smuggling and trafficking

fees, request additional fees from aliens and/or their sponsors, and coordinate drivers to synchronize an exact drop off and/or pick up time of their aliens.

      e.   The use of cellular telephones by smugglers and traffickers tends to generate evidence that is stored on the cellular telephones including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

## FACTS SUPPORTING PROBABLE CAUSE

     14.   On November 15, 2014, at 1:43 a.m., Brawley Police dispatch received a 9-1-1 call from a man reporting that someone was trying to kill him. Brawley Police officers were able to narrow the call to the 1500 block of A Street in Brawley, California.

     15.   Brawley Police Sergeant Monita drove to the 1500 block in Brawley, California and observed two males in the back yard of 1537 A Street, Brawley, California ("1537 A STREET"). Sergeant Monita called out to one of the men, who he recognized as Raul Perez ("PEREZ"), also known to him as "Tiger." Before a conversation could ensue, Sergeant Monita heard banging noises and a man yelling from inside the property. Sergeant Monita asked PEREZ who was making the noise. PEREZ replied that it was his friend "Gordo."

     16.   Sergeant Monita entered the yard and immediately determined the yelling and banging was coming from a small shed. Sergeant Monita asked PEREZ who was in the shed. PEREZ said he did not know. The door to the shed was chained and padlocked. PEREZ told Sergeant Monita he did not have a key. The occupant of the shed called out for help. Sergeant Monita pried the door open enough for the man inside to slip out.

17.    The subject from inside the shed was identified by officers as Francisco Javier Gonzalez-Gonzalez ("GONZALEZ"). When first freed, GONZALEZ made some incoherent statements and told officers he did not wish to speak with the officers while at the 1537 A STREET. Officers then transported GONZALEZ to the Brawley Police Department and released PEREZ.

18.    Before they left the 1537 A STREET, officers walked through the house and other structures on the property to determine if anyone else was being held against their will. They did not find anyone.

19.    In the police department, GONZALEZ told officers that he was an illegal alien ("IA") from Mexico and had made an illegal entry on November 8, 2014. GONZALEZ stated he had made arrangements with an ASO to smuggle him into the United States for a payment of $5,000.

20.    GONZALEZ explained that the ASO arranged for him to climb over the international boundary fence near the Calexico, California East Port of Entry. GONZALEZ told officers that he and three other IAs jumped the fence together and ran to the nearby Jack in the Box restaurant. There, a male and female, later identified as Jose Duarte ("DUARTE") and Kendra Telford ("TELFORD"), picked up the IAs in a black Dodge Durango ("DURANGO").

21. GONZALEZ told officers that DUARTE and TELFORD transported the IAs to a house in Brawley, California, where GONZALEZ remained for four days. During this time, GONZALEZ stated there were many other IAs who came and went. GONZALEZ said many people used and sold drugs at the house.

22.    GONZALEZ told officers that he did not have the money to pay the ASO and he attempted to make a deal with DUARTE and TELFORD. While

7

DUARTE and TELFORD took GONZALEZ for a ride to the greater Los Angeles area for unknown reasons, GONZALEZ offered to have his daughter, Rosie Gonzalez, wire DUARTE and TELFORD $400. GONZALEZ also offered DUARTE and TELFORD his Honda Accord that was parked at his daughter's house in Phoenix, Arizona.

23.   On November 14, 2014, Rosie Gonzalez told officers a group of armed men (three or four) and one woman came to her residence in Phoenix, Arizona, on November 14, 2014, and took GONZALEZ's car. Rosie Gonzalez also provided a copy of a Western Union receipt for $400 wired to TELFORD.

24.   GONZALEZ told officers, after the arrangements had been made concerning the cash and vehicle, DUARTE and TELFORD drove him to the Motel 6 located in Brawley, California.[1] GONZALEZ said he was kept in a room, where a man he had never met before assaulted him. GONZALEZ stated he was punched and kicked in the head and body by this man. After the man stopped beating him, GONZALEZ was assaulted by DUARTE.

25.   GONZALEZ stated that a short time later another IA arrived at the Motel 6 room and that both of them were transported by DUARTE, TELFORD, and another man to 1537 A STREET. At 1537 A STREET, GONZLAEZ and the other IA from Motel 6 were both placed in the shed. The other man spent approximately two hours in the shed before he was taken out. GONZALEZ said he overheard two men talking outside the shed about killing him because he could not pay them. GONZALEZ said he then used his cell phone to call for help.

_____

[1]   GONZALEZ believes that the date was November 14, 2014 and the time was approximately 2100 hours.

26. On November 15, 2014, at approximately 3:20 a.m., officers noticed the DURANGO at 1537 A STREET. The DURANGO was occupied by a male and female, later identified as DURATE and TELFORD. DUARTE and TELFORD were taken to the Brawley Police Department.

27. At the Brawley Police Department, officers arranged for GONZALEZ to see DUARTE and TELFORD. GONZALEZ positively identified the two as the occupants of the DURANGO who had picked him up at the Jack in the Box after his illegal entry and had been transporting him over the past week.

28. On November 15, 2014, HSI agents asked DUARTE and TELFORD if they would speak with them. DUARTE and TELFORD agreed. DUARTE denied transporting anyone other than TELFORD in the DURANGO during the past two weeks. TELFORD said only she and DUARTE had been in the DURANGO. Later, TELFORD said she and DUARTE had given a ride to a man named "Juan." TELFORD said she didn't remember where she had met "Juan."

29. **TARGET TELEPHONE #1** and **TARGET TELEPHONE #2** were found on DUARTE at time of arrest.

30. **TARGET TELEPHONES #3, #4** and **#5** were seized from the DURANGO, which is registered to TELFORD, on November 19, 2014. **TARGET TELEPHONE #3** was located in the glove compartment, **TARGET TELEPHONE #4** was located in the front console, and **TARGET TELEPHONE #4** was located in the trunk of the vehicle.

31. Shortly after the phones were discovered, agents conducted a cursory search of **TARGET TELEPHONE #2** for information related to other victims that agents feared were being held against their will. Agents were not searching for

9

evidence of violations of Title 8, U.S.C. § 1324(a)(ii) and (iii), and none was found.

32.    Agents located a photograph taken at the Highway 86 Border Patrol Checkpoint on November 13, 2014, at approximately 6:35 p.m., that appears to show the DURANGO occupied by DUARTE, TELFORD, and GONZALEZ.

## METHODOLOGY

33.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.   An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.   For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.   Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.   Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.   Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.   For devices that are not subject to forensic

data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. In some instances the phones and its components may be destroyed and/or altered in attempt to recover the information. This process is time and labor intensive and may take weeks or longer.

34.    Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards, call detail records, and deleted files will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

35.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

36.    Based upon my training and experience and all the facts and opinions set forth in this affidavit, I believe that probable cause exists to conclude that **TARGET TELEPHONES #1, #2, #3, #4,** and **#5** were used to facilitate the crimes of transporting illegal aliens and harboring illegal aliens by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of Title 8, U.S.C. § 1324(a)(ii) and (iii). There is also probable cause to believe that evidence, fruits and instrumentalities of the illegal activities committed by

11

DUARTE and TELFORD, as described in Attachment B, continue to exist on **TARGET TELEPHONES #1, #2, #3, #4, and #5.**

37.    Therefore, I respectfully request that the Court issue a warrant authorizing me, a Special Agent with Homeland Security Investigations, or another federal or state law enforcement agent specially trained in digital evidence recovery, to search the item described in Attachment A, and seize the items listed in Attachment B.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Brian M. Quigg
Special Agent, HSI

Subscribed and sworn to before me this _____ *10ᵗʰ* _____ day of December, 2014.

Hon. Peter C. Lewis
United States Magistrate Judge

12

# ATTACHMENT B

## PROPERTY/ITEMS TO BE SEARCHED

The items to be seized are electronic data that constitute evidence or fruits of the commission of a criminal offense, and electronic data which is and has been used as the means for committing a criminal offense. The specific criminal offenses involved are violations of Title 8 U.S.C. 1324(a)(ii) and (iii), Transporting Illegal Aliens and Harboring Illegal Aliens.

Communications, records, call detail records, data, any deleted data, including but not limited to emails, phone numbers, text messages, photographs, audio files, videos, or location data:

    a.    tending to indicate efforts to transport and harbor illegal aliens;

    b.    tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to prove the transportation and harboring of illegal aliens;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the transport and harboring of illegal aliens;

    d.    tending to identify travel to or presence at locations involved in the smuggling of illegal aliens, such as stash locations, storefronts, delivery points, and residence locations associated with the transport and smuggling of aliens;

    e.    tending to identify the user of, or persons with control over or access to, the subject phone; or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.